1   RANDY SUE POLLOCK
    Attorney at Law (CSBN 64493)
2   2831 Telegraph Avenue
    Oakland, CA 94609
3   Tel: (510)763-9967
    Fax: (510)272-0711
4   pollockesq@aol.com

5   Attorney for Defendant
    **DYLAN HUDSON**

6

7

8

9                   UNITED STATES DISTRICT COURT

10                  EASTERN DISTRICT OF CALIFORNIA

11                              –ooo–

12  UNITED STATES OF AMERICA,          No.  CR. 12-0130-GEB

13              Plaintiff,             **SENTENCING MEMORANDUM ON
                                       BEHALF OF DYLAN HUDSON**
14  vs.

15                                     _____

16  DYLAN HUDSON,                      **Sentencing Date:     July 19, 2013
                                       Sentencing Time:     9 a.m.**
17              Defendant
    _____/

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ......................................................... ii

TABLE OF EXHIBITS ........................................................... iv

PRELIMINARY STATEMENT ..................................................... 1

I.    PRESENTENCE REPORT ..................................................... 1

II.    ADDITIONAL OBJECTIONS TO PRESENTENCE REPORT .................... 1

III.    SENTENCING RECOMMENDATION ........................................ 2

    A.    DYLAN HUDSON'S PERSONAL BACKGROUND ...................... 2

    B.    THE MENTAL AND PHYSICAL ABUSE SUFFERED DURING DYLAN HUDSON'S YOUTH DID SIGNIFICANTLY IMPAIR HIS JUDGMENT IN THIS CASE AND WARRANTS A DEPARTURE UNDER USSG 5H1.3 ................................................. 3

    C.    PRISON HAS A GREATER SIGNIFICANCE FOR THOSE IMPRISONED FOR THE FIRST TIME ................................. 6

    D.    MR. HUDSON SHOULD ONLY RECEIVE THREE (3) POINTS FOR HIS ROLE IN THIS OFFENSE ........................................ 6

    E.    DYLAN HUDSON SHOULD NOT RECEIVE A TWO POINT ADJUSTMENT FOR THE GUNS FOUND ON THE TWO PROPERTIES .... 7

CONCLUSION ................................................................. 8

1

<u>**TABLE OF AUTHORITIES**</u>

2

*Page*

3

**Federal Cases**

4

*Santosky vs. Kramer*
       455 U.S. 745 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5

*United States vs. Baker*
       445 F.3d 987 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6

7

*United States vs. Booker*
       543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8

*United States vs. Collington*
       461 F.3d 805 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

9

10

*United States vs. Lagasse*
       87 F.3d 18 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11

*United States vs. Ledezma*
       4143225 (E.D.Wis. November 19, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12

13

*United States vs. Lopez*
       416 F.3d 713 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14

*United States vs. Patzer*
       548 F.Supp.2d 612 (N.D. Ill., 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15

16

17

**Federal Statutes**

18

18 U.S.C.
       Section 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

19

21 U.S.C.
       Section 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

20

       Section 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

(Continued)

3

*Page*

4

**United States Sentencing Guidelines**

5

Section 2D1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

6

Section 5K1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7

Section 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8

Section 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

9

Section 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10

Section 3553(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11

Section 3553(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12

Section 3553(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13

14

**Eastern District Local Rules**

15

32-460 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16

17

18

19

20

21

22

23

24

25

26

27

28

Sentencing Memorandum on Behalf
of Dylan Hudson, CR12-0130 GEB

1

### TABLE OF EXHIBITS

2    A      Plea Agreement

3    B      Discovery, page 285, listing correct drug weights from October 2010 to date of seizure

4    C      Psychological report by Dr. Weber

5    D      Drawing by Special Agent J. Beeson of 3000 Charm Way in Placerville

6    E      Dylan Hudson's letter to court

7    F      Dylan Hudson's character reference letters

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **PRELIMINARY STATEMENT**

2    Dylan Hudson is scheduled to be sentenced by this Court on July 19, 2013 following his

3    plea of guilty on February 15, 2013 to a violation of 21 U.S.C. Section 846 and 841(a)(1),

4    Conspiracy to Manufacture, Distribute and to Possess with Intent to Distribute Marijuana.  This

5    memorandum is submitted to respectfully request the Court to impose a reasonable sentence after

6    consideration of the factors identified under 18 U.S.C. Section 3553(a) and the facts and record in

7    this case.

8    **I.**

9    **PRESENTENCE REPORT**

10   The Probation Department has determined the adjusted offense level to be 33 and

11   the criminal history to be Category One (1 point), resulting in an advisory guideline range of **135 to**

12   **168 months**.  The probation officer is recommending the low end of the advisory guidelines based

13   on the emotional and physical abuse that Dylan suffered during his youth. The defense believes that

14   certain objections have not been addressed by probation.  Additionally, factors do exist that would

15   warrant a variance under USSG 3553(a). The government is expected to make a motion for a

16   reduction in the sentence pursuant to USSG 5K1.1.

17   **II.**

18   **ADDITIONAL OBJECTIONS TO PRESENTENCE REPORT**

19   Pursuant to Local Rule 32-460, counsel submitted two sets of objections to the PSR.  The

20   following objections were not responded to by Probation:

21   **1.       Page 8, paragraph 24:  Weight of Drugs**

22   The total weight that Probation states is 629.8 kilograms of marijuana.  Offense level 28

23   includes at least 400 kilograms but not less than 700 kilograms of marijuana.  In this case, Exhibit

24   A to the plea agreement stated the total amount of drugs which is not the amount listed by probation.

25   **See Exhibit A, plea agreement**.  The amount of processed marijuana was 499.655 lbs.  Page 285

26   of the discovery states the correct weights from October 2010 to the date of the seizure.  **Exhibit B**.

27   While probation correctly notes that this will still place Mr. Hudson in offense level 28, it is

28   importance that the PSR be accurate regarding the weight as it will be viewed and considered by

1    BOP for various reasons.

2          **2.      Page 19: Probation Recommends a Fine of $17,500.00.**

3          While Mr. Hudson does not have any assets left as everything was seized and forfeited by the

4    government, a fine under USSG Section 5E1.2(a) shall be imposed in all cases, except where the

5    defendant establishes that he is unable to pay and is unlikely to become able to pay a fine.

6          Moreover, commentary number 3 to the above-stated guideline section notes that the

7    determination of a fine may be dispensed with entirely upon a court determination of present and

8    future inability to pay a fine.  The fact that Mr. Hudson's family hired private counsel should have

9    no bearing on this finding.  While Mr. Hudson does not have any dependents at this time, this fine

10   upon his release will be an undue burden.  Although he may very well have the capacity to become

11   gainfully employed upon his release and he fully intends to do so, a minimal fine is all that he will

12   be able to afford.  He will not have a car or a home.  His mother's illness will impact him as he will

13   surely want to assist her.  A fine in the are of $1500.00-$2000.00 or community service is far more

14   reasonable.  See USSG Section 5E1.2(e).

15         **3.      Special Conditions of Release, No. 6, page 22:**

16         Counsel previously objected to this condition as it will force Mr. Hudson to forego job

17   opportunities in areas in which he has previously been employed.  As written in the probation report,

18   Mr. Hudson has an addiction to drugs, not alcohol.  One of his main forms of legitimate employment

19   was working as a DJ at music event promotions.  This type of work is done in bars and/or

20   nightclubs.  He has a history of this type of work and the proposed condition will unduly impair his

21   ability to work in an area where alcohol will be served.

22                                                           **III.**

23                         **<u>SENTENCING RECOMMENDATION</u>**

24   **A.      DYLAN HUDSON'S PERSONAL BACKGROUND**

25         The probation report describes Dylan's upbringing and the problems inflicted on

26   him during his youth by both his father and his step-father.  He was a child who could not defend

27   himself who was dependent on an abusive father.  Probation recommends a sentence at the low-end

28   of the guidelines because of his physical and emotional abuse but does not believe that an

1   adjustment under USSG Section 5H1.3 is warranted.

2   **B.      THE MENTAL AND PHYSICAL ABUSE SUFFERED DURING DYLAN
            HUDSON'S YOUTH DID SIGNIFICANTLY IMPAIR HIS JUDGMENT IN**
3           **THIS CASE AND WARRANTS A DEPARTURE UNDER USSG 5H1.3**

4          The probation report, Dylan's letter to this Court (Exhibit A) and Dr. Weber's psychological

5   report (Exhibit C) each depict an incredibly difficult childhood for Dylan that consisted of necessary

6   abandonment by his mother due to her illness, constant concern by Dylan regarding the health of

7   both of his parents, and the physical and psychological abuse inflicted on him by his father.  Dylan

8   endured an unfortunate childhood.

9          Studies are clear that children who endure difficult childhoods have significant problems

10  once they grow up.  See *Santosky vs. Kramer*, 455 U.S. 745, 789 (1982):

11         "It requires no citation of authority to assert that children who are abused in their

12         youth generally face extraordinary problems developing into responsible productive

13         citizens".

14   In Dylan's case, Dr. Weber has explained the following:

15         "...that the memory of his upsetting experiences as a youth appear to come back in

16         intensive and distressing recollections. He avoids exposure to cues that resemble or

17         symbolize aspects of the traumatic event..."

18         "As a survivor of severe physical and emotional abuse...he shares certain

19         characteristics with other adult abuse survivors that may explain some of his

20         behavior.  **The first is low self-esteem....Mr. Hudson's shame, sense of**

21         **unworthiness and anger turned inward and pervaded his life and led to bad**

22         **decisions". (**emphasis added)

23         "The second common characteristic of adult survivors of abuse is self-

24         sabotaging...Survivors who grew up in addictive families may self-sabotage

25         by driving while drunk or getting caught with illegal drugs...It is interesting

26         to note that Mr. Hudson has actually experienced some of these common

27         problems.  He has been caught with illegal drugs and he has entered into

28         bad investments with his father".

Sentencing Memorandum on Behalf
of Dylan Hudson, CR12-0130 GEB                                                                    3

1  Dr. Weber concludes this report as follows:

2       "....As a result of this abuse, he developed certain maladaptive defense mechanisms

3       in order to cope with the consequences.  He has good insight into his psychological

4       problems and is open to intervention..."

5       "In my opinion, it is unlikely that Mr. Hudson would continue to be involved in

6       criminal enterprises.  He has the intelligence and social skills necessary to make a

7       successful transition back into society...and there is no indication that he has

8       developed an Antisocial Personality Disorder.

9       It is also my opinion that his risk for recidivism would decrease even further with

10       treatment for his substance abuse, and psychotherapy to help him process the trauma

11       of his physical and emotional abuse".

12       Under USSG 5H1.3, a court may look at the mental and emotional conditions individually

13  or in combination with other offender characteristics in making this determination.  The amendment

14  to this section by its terms only applies to departures and not to variances.  Of note is the case of

15  *United States vs. Roe* 976 F.2d 1216, 1218 (9th Cir. 1992 which explained that a court must

16  determine if the psychological effects of a defendant's childhood abuse constitute an extraordinary

17  circumstance warranting a departure [in this case, as a youth the defendant was often beaten,

18  routinely raped and sodomized and the mother's boyfriend urinated in her mouth].  In *United States*

19  *vs. Garza-Juarez, 992 F.2d 896* (9th Cir. 1993) the court found a downward departure based on the

20  defendant suffering from panic disorder with agoraphobia.  See also, *United States vs. Brown, 985*

21  *F.2d 478 (9th Cir. 1993)* which said that when childhood trauma was the primary cause of his

22  criminal behavior, a court could grant a downward departure.  See also, *United States vs. Walter*,

23  256 F.3d 891 (9th Cir. 2001).

24       The issue before this Court is two-fold; first, is Dylan Hudson's abuse 'extraordinary' and

25  second, is there a causal connection between his impaired emotional condition and the criminal

26  conduct.  Dr. Weber believes that there is, however probation disagrees.

27  Even if the abuse that Dylan suffered is not sufficient to be 'extraordinary' under the advisory

28  guidelines to justify a departure, it is a factor that this Court can consider under Section 3553(a) as a

1    variance.

2        There is substantial medical/psychological evidence showing that Dylan Hudson

3    is an individual suffering from a complex developmental trauma disorder resulting from chronic

4    abuse during childhood. As a result of this trauma, Dylan began abusing substances by the age of

5    11, first with the use of marijuana and tobacco and had full blown use of cocaine, MDMA and

6    methamphetamine by the age of 16.  This was compounded with more trauma and an increased

7    severity in his condition.

8        Major breakthroughs in neuroscience and trauma studies have shown the direct links

9    between childhood abuse and trauma and addiction.  Research in neuroscience and addiction

10   patterns show that people with long term cocaine use have problems with decision making because

11   of the damage of the prefrontal cortex. This frontal lobe region of the brain is the same area that is

12   shut down when a person suffers from trauma-related disorders.  This can be explanatory of the

13   reasons Dylan would make such irrational life choices and engage in this criminal activity. The

14   symptoms shown by Dylan throughout the period of his incarceration are substantial evidence of his

15   trauma-related disorder. Examples include: tape played to court of his behavior and treatment of

16   loved ones (his mother and his girlfriend Tabatha Stanton); irrational thoughts of escape; inability to

17   show affect, remorse or emotions; his testament of grandiosity; the physiological symptoms of rise in

18   blood pressure, lack of sleep and inability to hold conversation.

19       Research has also shown that when treated properly these symptoms can be reversed on a

20   cognitive, neurological, physiological and emotional level. With this intention in mind, it is vital for

21   Dylan to be put through an addiction treatment facility and then be released to work intensively with

22   his symptoms of trauma so he can work as the productive, intelligent, creative and caring person that

23   he is beyond the symptoms of his chronic suffering.

24       A reduced sentence would be vital to the rehabilitation of Dylan Hudson as the prison

25   system is not conducive to the type of environment needed to heal from the complex developmental

26   trauma he suffered and could lead to a worsening of symptoms and behaviors. While a prison

27   sentence is clearly required in this case, it need not be that lengthy given Dr. Weber's report.

28       Additionally, while Dylan's traumatic childhood and disadvantaged upbringing cannot be

Sentencing Memorandum on Behalf
of Dylan Hudson, CR12-0130 GEB                                                5

1  considered as a ground for departure from the advisory guidelines, they are clearly recognized as

2  grounds for variance under Section 3553(a).  See *United States vs. Patzer*, 548 F.Supp.2d 612

3  (N.D. Ill., 2008) in which a court imposed 13 years instead of 346 to 411 months in part due to

4  defendant's difficult childhood and that defendant had not been properly diagnosed and treated for

5  ADD and that his conduct stemmed from mental health and drug problems that were treatable and

6  that he had a potential for rehabilitation.  This is similar to the life that Dylan suffered and the future

7  that he has ahead of him.

8  **C.    PRISON HAS A GREATER SIGNIFICANCE FOR THOSE IMPRISONED**

9  **FOR THE FIRST TIME**

10        In conjunction with the findings of Dr. Weber that Dylan is unlikely to re-offend if provided

11  with treatment, to acknowledge that *United States vs. Baker,* 445 F.3d 987 (7th Cir. 2006)

12  recognized that a period of custody should resonate with the goal of "just punishment" in Section

13  3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B).  A non-guideline sentence far

14  less than that called for by probation would serve the needs of society for punishment and deterrence

15  and be "sufficient but not greater than necessary" to meet the goals of sentencing as established in

16  *United States vs. Booker*, 543 U.S. 220 (2005), and its progeny.  Likewise, as explained in *United*

17  *States vs. Collington*, 461 F.3d 805 (6th Cir. 2006), the advisory guideline sentence now

18  recommended does not reflect the fact that this is Dylan's first time in custody and he is a true

19  candidate for reform.

20  **D.    MR. HUDSON SHOULD ONLY RECEIVE THREE (3) POINTS FOR HIS**

21  **ROLE IN THIS OFFENSE**

22        The estimated guideline range in the plea agreement calls for three points for Dylan's role in

23  this offense.  Basically, he was the co-leader of the offense.  He did own the two properties in

24  question at Charm Way and Miner Valley Road; however, he had not lived at Miner Valley Road

25  for eight to nine months prior to his arrest.  Instead, Riley Hayes, a co-defendant being prosecuted in

26  state court, was running the operation.  Also, most of the marijuana found at Miner Valley Road

27  belonged to Riley Hayes.  Dylan and Riley lived together for over a year and a half before Dylan

28  moved into the dome structure on 3000 Charm Way.  In July 2011, Dylan told Riley Hayes that he

1   would cover his portion of the rent but that Riley Hayes should find a replacement roommate which

2   did occur in September 2011.  After Dylan moved into the dome he had no participation, control or

3   influence over the activities at Miner Valley Road.  Riley Hayes and Dylan Hudson split the

4   medicinal garden 50/50 along with costs.  Riley Hayes also packaged his marijuana and shipped it

5   to various distributors in Wisconsin, his home state.  Dylan never took any of Riley Hayes'

6   marijuana from Miner Valley Road to Charm Way.

7          While there can be more than one leader in a crime, the defense suggests that given Riley

8   Hayes' extensive involvement in Miner Valley Road and the fact that he is not being prosecuted

9   federally, that Dylan should only receive three points for a role adjustment.

10  **E.      DYLAN HUDSON SHOULD NOT RECEIVE A TWO POINT**

11  **         ADJUSTMENT FOR THE GUNS FOUND ON THE TWO PROPERTIES**

12         Eight different guns were found at various locations on the two properties in question,

13  Charm Way and Miner Valley Road.  An associate of Dylan's, Andrew Roberson, has taken full

14  responsibility for ownership of four of the guns.  Many of the guns the probation officer could not

15  determine were loaded.  One of the guns was found next to 290 kilograms of marijuana in the

16  trailer.  Dylan did not reside there and his dome was some distance from the trailer.  Four of the

17  weapons were found at Charm Way.

18         The position of Probation is that it is "highly unlikely that Dylan did not know that the

19  firearms were on his property."  What is ignored in this statement is that Dylan lived in the dome

20  structure and was not present for a considerable period of time.  As the owner of the properties and

21  one of the organizers of this crime an inference could be drawn that he ***should have known*** that

22  guns were on his property but the law requires more for this adjustment to be imposed.  **Exhibit D**,

23  attached herewith, is a drawing by Special Agent J. Beeson on March 12, 2012, of the property at

24  3000 Charm Way in Placerville.  As can be seen, the trailers are in a totally separate location from

25  the dome (yurt) where Dylan resided.  The property was large with numerous structures and

26  outbuildings, including a large barn, a mobile home, a trailer, a green house, a residence and

27  numerous other structures, including the dome.

28         Under USSG Section 2D1.1(b)(1), while relevant conduct is to be considered in the

1   application of this guideline, there must be some connection between the guns and the offense. The

2   mere presence of weapons as well as the fact that they are not in the same location as the drugs does

3   not mean that they were connected to the offense. Their presence on the property is not sufficient for

4   this adjustment. There must be circumstances that permit an inference that the guns served to

5   protect or otherwise facilitate the offense conduct. That is missing in this case. See *United States*

6   *vs. Lagasse*, 87 F.3d 18 (1st Cir. 1996) and *United States vs. Lopez*, 416 F.3d 713, 716 (8th Cir.

7   2005).

8        An adjustment under USSG 2D1.1(b)(1) has serious repercussions for Dylan. Not only does

9   it increase his base offense level but it will increase his security rating as to where he is designated.

10  More important, given his personal history, is the fact that it will make him ineligible to receive a

11  reduction in his sentence for participation in RDAP. The enormous size of the property at Charm

12  Way negates an inference that Dylan should have known about the guns that were so far removed

13  from where he lived on the property and which did not belong to him.

14                                      **CONCLUSION**

15       Dylan Hudson is a young man who comes before this Court from a very troubled

16  childhood. He never should have gotten involved with his father who abused him so badly but a

17  child who endures such trauma does not think clearly. He lacked the youthful guidance that many

18  offenders who come before this Court lack; however, many did not suffer the abuse that he did. To

19  imagine a father putting his son through Russian Roulette is unthinkable and that is part of the

20  emotional trauma that Dylan lives with to this day.

21       Clearly, there was an element of greed in this offense. Dylan had a legitimate hyrdro

22  business but his father got him involved in far more and Dylan then needed other sources of money.

23  It is a story that this Court has heard countless times. However, in imposing a just and fair sentence

24  in this case it is important to be mindful of the fact that while Dylan is an intelligent young man, his

25  thought process was clouded by the years of abuse. This Court has the authority to grant a variance

26  due to mental and emotional disorders as well as substance abuse issues. The period of

27  incarceration to date has had a tremendous impact on Dylan. As this Court can see in Dylan's letter,

28  **Exhibit E**, he is truly remorseful for resorting to criminal conduct in order to deal with his financial

1   situation.

2        This Court must not only determine the advisory Guideline range but also after considering

3   18 USSG Section 3553(a), determine whether a sentence within, above, or below the advisory

4   Guidelines range is "sufficient but not greater than necessary" to comply with Section 3553(a)(2).

5   The government's motion pursuant to 5K1.1 will lower the advisory guideline range, but only

6   Section 3553(e) will give this Court the authority to sentence below any mandatory minimum.  The

7   Guidelines are advisory but Section 3553(e) is not.  Alternatively, Section 3553(a) can be used to

8   argue for a sentence below both the advisory range and the mandatory minimum after the latter is

9   reached by Section 3553(e).  See *United States vs. Ledezma*, 4143225 (E.D.Wis. November 19,

10  2007).

11       In this case, counsel has presented a thorough psychological report that establishes grounds

12  for a departure under the advisory guidelines.  Dylan has been cooperative and is truly remorseful to

13  this Court and to his family and fully accepts responsibility for his actions.   He is not seeking to use

14  any excuse for his conduct however it is clear that he suffered a personal trauma that set him back

15  emotionally and socially.   He knows that the choices he made were very wrong and he will not be

16  before any Court of law again.

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

Sentencing Memorandum on Behalf
of Dylan Hudson, CR12-0130 GEB                                                              9

1        Dylan, as described in many of the attached letters, **Exhibit F**, is a young man with a

2    troubled past but who does have a future. Based on the history and personal characteristics of Dylan,

3    specifically, his age, minimal record, his emotional condition, lack of youthful guidance and his

4    prompt cooperation with the authorities, it is respectfully requested that a sentence in the range of

5    five to six years be imposed.

6      Dated:  July 7, 2013                         Respectfully submitted,

7

8                                                    /s/ RANDY SUE POLLOCK
                                                    _____
9                                                    RANDY SUE POLLOCK
                                                    Attorney for Defendant
10                                                   **DYLAN HUDSON**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28