*United States v. Dylan Hudson,* CR12-0130 GEB

# EXHIBIT A

# TO SENTENCING MEMORANDUM
# ON BEHALF OF DYLAN HUDSON

1

### EXHIBIT "A"

2

### Factual Basis for Plea

3   In 2012, law enforcement investigated marijuana trafficking by the
    defendant, Dylan HUDSON, and his associates.  Surveillance, seizures
4   of drugs and other records indicated that defendant Dylan HUDSON and
    others, beginning in 2010 and ending in March 2012, agreed to
5   manufacture, process and sell marijuana for profit.  The marijuana
    conspiracy took place in the Eastern District of California and
6   elsewhere.

7   On March 2, 2012, a co-conspirator shipped a wooden freight box
    containing approximately 89 pounds of marijuana to Chicago, IL to
8   defendant HUDSON. Agents searched HUDSON's storage locker and his
    Chicago hotel room.  In the storage locker, agents seized
9   approximately 130 pounds of processed marijuana.  In the hotel room,
    agents seized $269,060.00.

10

    On March 8, 2012, agents searched HUDSON's property at 3000 Charm Way
11  in Placerville, CA.  They seized approximately 946 pounds of
    processed marijuana, 100 marijuana plants, eight firearms,
12  $60,000.00, six silver bars, four gold coins, scales, packing
    materials, vacuum sealers, and pay/owe sheets.  During the process of
13  securing the property and executing the search warrant, law
    enforcement officers encountered an active marijuana processing
14  operation and an indoor marijuana grow house.

15  During the execution of the search warrant at 3000 Charm Way, agents
    discovered evidence linking HUDSON to a property at 5055 Miners
16  Valley Road, Pilot Hill, CA.  On March 9, 2012, agents executed a
    state search warrant on the property at 5055 Miners Valley, seizing
17  100 marijuana plants, approximately 73 pounds of processed marijuana,
    and $2,302.00.

18

    On March 13, 2012, agents searched a storage unit and a car connected
19  to HUDSON's conspiracy to sell marijuana and found 14 pounds and 56
    pounds of processed marijuana respectively.

20

21

22

23

24

25

26

27

28

*United States v. Dylan Hudson,* CR12-0130 GEB

# EXHIBIT B

# TO SENTENCING MEMORANDUM
# ON BEHALF OF DYLAN HUDSON

Dates     10/21/10   to Present

| Weights of Product | | | |
|---|---|---|---|
| | 3000 Charm Way | 429,260 g | ~ 946.356 lbs |
| | 5055 Miner Valley Road | 33,335 g | ~ 73.491 lbs |
| | Initial Seizure in W Sac | 40,426.9 g | ~ 89.126 lbs |
| | Hayes Storage / Vehicle | | ~ 70.89 lbs |
| | Wisconsin Storage | | ~ 130.12 lbs |
| | | | 1309.983 |

| Ledgers | | |
|---|---|---|
| | Located at 5055 Miners Valley 10/21/10 to 11/14/10 | 119.03 lbs |
| | Located at 3000 Charm Way 8/7/11 to 8/15/11 | 24.88 lbs |
| | Located at 3000 Charm Way 10/19/11 to 11/19/11 | 499.655 lbs |
| | | 643.565 lbs |

10/21/10 to Present Constructive Weight       1953.548 lbs

(Does not include ledger 3/1/12 to 3/5/12      2253 lbs)

| Plants | | | |
|---|---|---|---|
| | 3000 Charm Way | 29 | In mobile |
| | " | 100 | outside/greenhouse grow |
| | 5055 Miners Valley | 92 | outside greenhouse |
| | | 8 | garage |

00285

*United States v. Dylan Hudson,* CR12-0130 GEB

# EXHIBIT C

# TO SENTENCING MEMORANDUM
# ON BEHALF OF DYLAN HUDSON

# FRANK D. WEBER, Ph.D., ABPP
2277 FAIR OAKS BLVD., STE. 190
SACRAMENTO, CA 95825
(916) 479-2022  Fax (916) 923-9372
dr_weber@sbcglobal.net

## Psychological Evaluation

March 4, 2013

Randi Sue Pollock
2831 Telegraph Avenue
Oakland, CA  94609

**Subject:** Dylan Hudson
**Case No:** 2:12-CR-00130-GEB

I was retained to examine Dylan Hudson. The defendant pled guilty to a violation of Title 21, United States Code, Section 846 and 841(a)(1), Conspiracy to Manufacture, Distribute and Possess with Intent to Distribute Marijuana, Felony and 21 United States Code, Section 853(a), Criminal Forfeiture.  The defendant was interviewed at the Butte County Jail in Oroville, CA on January 08, 2013.

**INFORMED CONSENT:** Before conducting the evaluation, the examiner informed the defendant of the purposes and probable use of the evaluation, as well as the limitations of confidentiality. He was advised that the examiner is acting in the role of an evaluator and not a treating professional. He was informed that the examiner will prepare a report which will be submitted to his attorney, that any history of perpetration of physical or sexual abuse can by reported, and that his participation is voluntary. The defendant indicated that he understood the scope and intent of the evaluation and agreed to participate under these conditions.

**RECORDS REVIEWED:**

Indictment (03/29/2012)
Life History of Dylan Hudson completed by his mother (no date)

**EVALUATION PROCEDURES:**

Clinical Interview of Defendant
Test of Nonverbal Intelligence – 3rd Edition (TONI-3)
Millon Clinical Multiaxial Inventory – 3rd Edition (MCMI-III)

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

Review of Available Records

**MENTAL STATUS EXAMINATION AND BEHAVIORAL OBSERVATIONS:** The interview began at approximately 1300 hours when the defendant entered the interview room. He presented as a 27-year-old Caucasian male of muscular build and average stature. He wore a county-issued orange jumpsuit. His grooming and hygiene were fair. He reported he understood the purpose of the evaluation.  His speech was of normal rate and rhythm. He was oriented to person and place, and date. He responded in an open and honest manner and appeared to be an accurate historian.

He reported that his mood was "a little nervous," and he exhibited a full range of affect during the evaluation. There were times when he wept openly when discussing the physical abuse suffered at the hands of his father but there was no evidence of unusual emotional expression, physiological disturbance, or psychomotor retardation or agitation during the evaluation.  Based on the content and his usage of language he appears to function in the average range of intellectual ability.  His level of consciousness was not impaired. His remote, recent, and immediate memory all appeared to be unimpaired, and he had no difficulty remembering details about his background history.

He was able to count backwards from 20-1 and he was able to say the alphabet without error. The defendant was asked to remember three simple words. He was able to repeat these words back to the examiner immediately. At one minute he remembered three of them. At five minutes the defendant remembered three of them. When asked who the last three U.S. presidents were he stated, "Bush, Clinton, I don't know." When asked who the current U.S. president was he stated, "Obama." He was able to comprehend an appropriate solution to a situational problem. When asked what he would do if he found a letter on the street with an address and a new stamp on it, he responded, "I'd put it in the mail box." His thought processes were logical and coherent.  He was able to understand simple proverbs. When asked what "Don't judge a book by its cover meant, he stated, "There's more complexity to an issue that what there appears." He denied auditory or visual hallucinations, and there was no evidence of thought disorder, paranoia, intrusive thoughts, delusions, perceptual disorders, or obsessive thinking. He denied suicidal or homicidal ideation, and does not have any active plan or intent for the same.

**DEFENDANT HISTORY:** Mr. Hudson reported that he was born in Milwaukee, WI to his parents who were never married. He lived with his mother initially but also lived with his father in California at times. His mother met his father when she was travelling in California, and when she became pregnant with his older brother, she moved back to Wisconsin to be with her family there. Mr. Hudson was conceived during a visit to Wisconsin by his father. Around the age of 3, he and his brother spent a year with his father before moving back to Wisconsin. In the 2nd grade he moved with his mother and brother to Big Sur, CA. In the 5th grade his mother, step-father and older brother sailed to Costa Rica. They were gone for a year and then they moved back to Viola, WI because his mother became pregnant again. From the 6th grade to the 9th grade he lived with his mother again in Wisconsin. At the end of his 9th grade year he moved back to California to live with his father again. His mother stated that he was "out of control" and that she had placed him in

2

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

foster care earlier in the year because he would not obey the house rules. Halfway through his 10th grade year he got into an altercation with his father in which his father beat him severely. Mr. Hudson finished his 10th grade year in Viola and eventually earned his high school diploma there. In addition to his older brother (29) who is the product of the relationship between his mother and father, he has a half brother (18) and a half sister (16) from the union and his mother and step-father.

His father married his step-mother when Mr. Hudson was 9 years old but they had been together for several years before that time. His father divorced his step-mother approximately 14 years ago. He stated that is father and step-mother would argue a lot but that he did not witness any domestic violence between them. His mother married his step-father when Mr. Hudson was very young. He said that his step-father was from South Africa, and he was very strict and believed in corporal punishment. He reported that he received physical punishment about once a month from his step-father. He said that he was hit with a belt and with "switches." His mother and step-father moved to Grass Valley, CA when Mr. Hudson was approximately 20 years old where his mother worked as a massage therapist and his step-father worked, converting existing buildings so that they are more energy efficient.

He reported that his biological father had a drug problem. He reported that when he was living with or visiting his father, approximately once or twice a month his father would come home intoxicated on alcohol and cocaine, and become physically abusive towards him. He reported that his father broke his nose once by kicking him in the face. He said that the beatings would "come out of nowhere" and range from slaps and punches, to full beatings. He said that when he was in the fifth grade and his mother had left for Costa Rica, the abuse worsened. Due to the abuse, during his fifth grade year he joined his mother and step-father on their boat for 2-3 months before they left for Wisconsin. He said that his father was a "positive person" when he was not drunk. When he was living with his father at the end of his ninth grade year, the physical abuse continued. He said that one time his father hit him with a stool and dislocated his shoulder. During this period of time, Mr. Hudson described a particularly disturbing incident when his father played "Russian roulette" with him. He said that his father pointed the gun at him, pulled the trigger and then pointed the gun at himself and pulled the trigger. He stated that neither one was injured but that he was terrified.

After high school he toured Europe for approximately four months and then started attending a technical college in Madison, Wisconsin. He lived in Madison for the next four years attending this technical college off and on. When he was 20 years old his friend committed suicide and Mr. Hudson said he blamed himself. He did not attend school for the next year and a half because of his distress. It was during this time his drug use increased as well. After a year and a half he said that he decided to "focus more" but when he was 21 years old he was convicted on a marijuana possession charge. He was sentenced to 5 years probation but was released after three years. When

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

he was released from probation he moved to Grass Valley, CA to be close to his mother. While in Grass Valley, he started his own event production company and in 2009 he opened a hydroponics store in Sacramento and moved to El Dorado Hills, CA. At this time he and his father began to rebuild their relationship. He said that he had not seen his father since he was 18 years old. They decided to buy some property to develop in Placerville, CA. However, his father was fighting a vehicular manslaughter case and was suffering from end stage liver disease due to Hepatitis C. For these reasons his father could not contribute financially to the project and Mr. Hudson's hydroponics store was losing money due to embezzlement by his partner. Due to these financial setbacks, he began growing marijuana in order to sell to dispensaries. However, due to his knowledge of hydroponics, his crop exceeded the state limits so he began selling the excess. He said that he sold the marijuana to someone who shipped it to Wisconsin. He said that he went to Wisconsin to introduce the buyer and seller. He was arrested in March 2012 for his role in this transaction.

**EMPLOYMENT HISTORY:**  Mr. Hudson stated that he began to work when he was 18 years old. He worked as a stocker at a grocery store. After six months he was promoted to the position of dairy buyer. He was only able to stay in this position for six months because of an illness related to spending so much time in the cooler. He also admitted that his drug use affected his decision to quit as well. At age 19 his worked for a health food co-op for approximately one year before quitting in order to focus on school. Also, at age 19, he began to work as a DJ. At age 21 he began working at a restaurant as a server. He worked there for two years before quitting and beginning work at another restaurant. He worked as this other restaurant for a year before moving to California. After arriving in California he began working as a DJ, averaging three nights a week. He also began his own event production company and hydroponics store. He eventually stopped working as a DJ in 2010.

**EDUCATION HISTORY:** Mr. Hudson reported that he did well in elementary school and denied behavioral problems. However, beginning in the 7th grade, he began to be "rebellious." He stated that he was truant approximately twice a week from the 7th through the 10th grades. At one point, he ran away from home and was placed in foster care for approximately one year and he failed the 8th and 9th grades. He earned C's and D's in the first half of his 10th grade year. He performed much better during the second half of his 10th grade year. He doubled up on his classes and earned a 3.0 GPA and was eventually able to graduate with a diploma. After earning his high school diploma, he attended a technical school in Madison, WI off-and-on for approximately three years. As stated above, when his friend committed suicide, he dropped out of college.

**MENTAL HEALTH/PHYSICAL HEALTH HISTORY:**  Mr. Hudson stated that he attended "a couple sessions" of counseling when he was younger for "anger management." He also reported that he attended a few sessions of counseling after he returned from California in the 10th grade.

4

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

His mother stated that he would not talk to the therapist. However, he stated that he made the greatest improvement after a teacher in the 10th grade took an interest in him and helped him to change. This teacher convinced him that he was "sabotaging" himself. After his conviction for possession of marijuana when he was 21 years old, he attended one session of drug counseling. He denied ever being prescribed psychiatric medication.

Currently, he reported experiencing some situational stress due to his current situation. He also reported feeling stress regarding his father's failing health. In addition, his step-father has throat cancer and his mother has type II diabetes. He said that he feels down at times due to these stressors, but otherwise is trying to maintain a positive attitude.

**DRUG AND ALCOHOL HISTORY**: Mr. Hudson reported that he first tried marijuana in the fifth grade and began regular use in the 7th grade. He smoked on a daily basis from the 7th to the 10th grade. In the 10th grade he was placed on house arrest after an altercation with his step-father, so he did not smoke for a year. However, after that year finished he began smoking marijuana again on a daily basis until his arrest on the instant offense. After his friend committed suicide, his drug use increased. From the age of 20 to 21 (approximately 1 ½ years) he reported experimenting with cocaine, heroin, ecstasy, and methamphetamine. He reported "using anything that came in front of me." At age 21 he was placed on probation so he discontinued all drug use except alcohol and marijuana. The first time he tried alcohol was when he was in high school. He stated that he had a bad experience so was only a social drinker in college until the age of 22. From 22 to 24 he reported binge drinking on the weekends. His drinking decreased until 2010 when his father's health deteriorated. For a few months he drank 1/2 to 1/3 of a bottle of vodka per day. He admitted that he turned to drugs and alcohol in an effort to "escape" and to control his anger due to the physical abuse. He said that it initially helped him to cope but then became a habit.

**CRIMINAL HISTORY**: The defendant reported being cited for disorderly conduct when he was 13 or 14 years old after a fight with his brother. When he was 16 years old he was cited and fined for underage drinking. On his 20th birthday he reported receiving a DUI. He had his license suspended for a year. When he was 21 years old he was cited for driving on a suspended license and was found guilty of possession of marijuana. He was sentenced to five years probation. Regarding the instant offense, he reported he began growing marijuana in order to sell to dispensaries. However, due to his knowledge of hydroponics, his crop exceeded the state limits so he began selling the excess. He said that he sold the marijuana to someone who shipped it to Wisconsin. He said that he went to Wisconsin to introduce the buyer and seller. He was arrested in March 2012 for his role in this transaction.

5

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

Records indicate that the defendant conspired to manufacture, distribute, and possess with the intent to distribute at least 100 kilograms of a mixture and substance containing a detectable amount of marijuana.

## TEST RESULTS AND INTERPRETATION

Cautionary note: The results of the tests should only be used to generate hypotheses and inferences about the examinee. The interpretive data presented below will not apply completely and unfailingly to each person with a specified protocol. In interpreting the test protocols one is dealing with probabilities. A particular extratest characteristic is more likely than another to apply to a person with a particular type of protocol, but there can never be complete certainty that it will. The inferences generated from an individual's protocol should thus be validated against other test and nontest information available about that individual.

**INTELLECTUAL FUNCTIONING**: The defendant was administered the Test of Nonverbal Intelligence-3rd Edition (TONI-3) in order to obtain an estimate of his intellectual functioning. The TONI-3 is a language-free measure of abstract/figural problem solving. The examinee must apply a variety of complex reasoning strategies to abstract/figural content. Since the TONI-3 only measures one skill (albeit an important one), the defendant's score should only be considered an estimate of his IQ.

On the TONI-3, the defendant's estimated IQ is 106 (Average range). This places him in the 66th percentile. There is a 95% chance that his true IQ falls between 100 and 112.

## PSYCHOLOGICAL/EMOTIONAL FUNCTIONING:

## MCMI-III

The Millon Clinical Multiaxial Inventory-III (MCMI-III) instrument provides a measure of 24 personality disorders and clinical syndromes for adults. Specifically designed to help assess both Axis I and Axis II disorders, this psychological test assists clinicians in psychiatric diagnosis, developing a treatment approach that takes into account the patient's personality style and coping behavior, and guiding treatment decisions based on the patient's personality pattern.

The MCMI-III is composed of 175 true-false questions and usually takes the average person less than 30 minutes to complete. After the test is scored, it produces 29 scales — 24 personality and clinical scales, and 5 scales used to verify how the person approached and took the test.

6

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

The Millon Clinical Multiaxial Inventory, 3rd edition (MCMI-III) is an update of the MCMI-II which represents ongoing research, conceptual developments, and the changes in the DSM-IV. It is a standardized, self-report questionnaire assessing a wide range of information related to personality, emotionality, and test-taking attitude.

The MCMI-III is often given in a clinical setting when questions arise about the specific diagnosis a person may have, or the personality traits or characteristics that the person has that may be impacting their ability to effectively cope with life or a mental health concern. It can readily illuminate personality traits and personality styles far more quickly and effectively than a clinical interview can for most clinicians.

RESPONSE TENDENCIES

Unless this man is a demonstrably well-functioning adult who is currently facing minor life stressors, his responses suggest (1) a well-established need for social approval and commendation, evident in tendencies to present himself in a favorable light, or (2) a general naiveté about psychological matters, including a possible deficit in self-knowledge. The interpretation of this profile should be made with these characteristics in mind.

The BR scores reported for this individual have been modified to account for the psychic tension indicated by the elevation on Scale A (Anxiety) and the defensiveness suggested by the prominence of Personality Patterns Scale 5 (Narcissistic).

PERSONALITY PATTERNS

The following paragraphs refer to those enduring and pervasive personality traits that underlie this man's emotional, cognitive, and interpersonal difficulties. Rather than focus on the largely transitory symptoms that make up Axis I clinical syndromes, this section concentrates on his more habitual and maladaptive methods of relating, behaving, thinking, and feeling.

The MCMI-III profile of this man suggests the presence of an arrogant sense of self-worth, a talent for feigning dignity and confidence, indifference to the welfare of others, and a facile--if not deceptive--social manner. There do appear to be tendencies to charm and exploit others, or to extract special recognition and consideration without assuming reciprocal responsibility. Actions that raise questions of personal integrity, such as circumventing social conventions, may also be present and indicate a rather deficient social conscience.

This man does attempt to maintain an image of cool strength, superiority, and cockiness. Self-reliance,

7

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

unsentimentality, and independence of other people and obligations are likely to be viewed by him as worthy traits and goals. More significantly, he may display a willingness to risk being caught in lies and deceptions. Criticism or condemnation is either dismissed as coming from jealous inferiors or is used to justify his own less than commendable inclinations. Such events may have led to personal and family difficulties and to occasional legal entanglements. Antisocial behavior, alcoholism, or drug problems would not be inconsistent with this picture.

If he is successful in keeping his life under control, he is likely to be skillful in the ways of social influence and adept at using the goodwill of others. However, he may be envious of others and wary of their motives. He may feel unfairly treated and may be easily provoked to anger. His facade of sociability can give way quickly to antagonistic and caustic comments. A marked suspicion of those in authority causes him to feel secure only when he is in control.

CLINICAL SYNDROMES

The features and dynamics of the following Axis I clinical syndromes appear worthy of description and analysis. They may arise in response to external precipitants but are likely to reflect and accentuate several of the more enduring and pervasive aspects of this man's basic personality makeup.

It appears that this man has been deeply involved in the abuse of drugs. He may use drugs not only to aid him in resolving his conflicts, in moderating his tensions, and in permitting him a measure of narcissistic indulgence, but also to serve as a statement of resentful independence from the constraints of social convention and expectation. In addition to giving him a sense of freedom from feelings of ambivalence toward himself and others, drugs liberate what guilt feelings he may have. Despite their apparent unrestrained quality, his defiant and resentful acts are fused with self-destructive elements. These are evident during periods of heavy use when he may throw caution to the winds, seemingly testing the fates and inviting serious injurious consequences to himself and others.

This man's responses to the MCMI-III indicate that he is subject to episodes of drug abuse, periods that unfold at times of frustration, disappointment, and resentment. Discontent is likely to be mixed with subsequent feelings of guilt and contrition. Both tend to be short-lived, although the destructive and injurious consequences may persist for some time. His drug use primarily serves to moderate the deep ambivalence he feels toward himself, his work, and his relationships with others.

The irritable and conflicted quality that appears to characterize this man's style currently seems to be complicated by a tense and apprehensive quality suggestive of a generalized anxiety disorder. Experiencing various physical symptoms, possibly such as muscular tightness, headaches, perspiration, and palpitations, as well as behavioral signs such as jumpiness and hyperdistractibility, this man may

8

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

feel trapped by his inability to work through his inner conflicts or by his powerlessness to confront what he sees as problematic forces about him. Much of his reported restlessness and edginess may derive their energy from the diffuse anxiety that he experiences.

This man appears to have experienced an event or events that may have involved physical threat or serious injury to which he responded with intense fear or horror. Although he is not characteristically fearful or anxious, the memory of this upsetting experience appears to come back in intensive and distressing recollections. He avoids exposure to cues that resemble or symbolize aspects of the traumatic event. Where they cannot be avoided, as in recurring nightmares and flashbacks, he may feel terrified, exhibiting a variety of signs of intense anxiety. Anticipation of their recurrence may result in persistent anxious symptoms, such as difficulty in sleeping, exaggerated startle response, or a protective numbing and detachment.

**SUMMARY:** Mr. Hudson reported a childhood marked by severe physical and emotional abuse at the hands of his father. The details of this abuse are reported above. As a survivor of severe childhood physical and emotional abuse, Mr. Hudson developed some common problems associated with this abuse. As an adult survivor of this type of abuse, he shares certain characteristics with other adult abuse survivors that may explain some of his behavior. The first characteristic is low self-esteem. Chronic feelings of being bad or unworthy are intricately connected to all the other "self" words that are used to describe the adult survivor: self-effacing, self-deprecating, self-conscious, self-blaming, and so on. Low self-esteem causes survivors to become their own worst enemies by turning against themselves in a damaging reenactment of their own abuse. There are many abuse-related factors that contribute to low self-esteem. The way his father treated him, the message he conveyed about his personal value and worth, the amount of power he granted him and the degree of control he had over his own life are a few examples. Mr. Hudson's shame, sense of unworthiness and anger turned inward and pervaded his life and led to bad decisions.

The second common characteristic of adult survivors of childhood physical and emotional abuse is self-sabotaging. Mr. Hudson reported that in the 10th grade one of his teachers pointed this out to him and this helped, in part, to his improvement during the latter half of high school. Self-sabotage is any kind of conscious or unconscious behavior that undermines successful functioning in the world. And even though he made improvements in the latter half of high school, this pattern often becomes ingrained in the person's personality. Self-sabotage may range from buying a "lemon" of a used car to losing one's checkbook to becoming involved with an alcoholic partner to engaging in life-threatening activities. Typically, one's pattern of self-sabotage is closely related to one's personal issues and family history. Survivors who grew up in addictive families may self-sabotage

9

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

by driving while drunk or getting caught with illegal drugs. Survivors from violent families may tend to get themselves beaten or injured. Survivors from wealthy families often find themselves losing money, getting swindled or making bad investments. It is interesting to note that Mr. Hudson has actually experienced some of these common problems. He has been caught with illegal drugs and he has entered into bad investments with his father.

However, Mr. Hudson does not appear to suffer from Posttraumatic Stress Disorder. Even though he reported symptoms of anxiety on the MCMI-III, when asked in an open-ended manner about psychological symptoms, he denied significant symptoms of anxiety or depression. In my opinion, the results from the MCMI-III may explain his lack of reported clinical symptoms. The MCMI-III indicates that he scored high on Scale 5 (Narcissistic). While the description of Scale 5 may seem negative, this is a common defense mechanism used by survivors of childhood abuse. In order to protect oneself psychologically, abuse survivors often develop a belief that they are superior to others. They come across as arrogant which serves as a means to keep others away and thereby protect oneself from being hurt again. At the core of this shield of superiority is a person who is shameful and afraid.

In summary, as a result of the severe physical and emotional abuse suffered at the hands of his father, Mr. Hudson developed low self-esteem and engaged in self-sabotaging behavior. This combination of factors, which is very common for adult survivors of childhood abuse, helps to explain his decisions to engage in criminal behavior and drug use.

**PROGNOSIS:** As stated above, Mr. Hudson was the victim of severe physical and emotional abuse. As a result of this abuse, he developed certain maladaptive defense mechanisms in order to cope with the consequences. He has good insight into his psychological problems and is open to intervention. Given the proper treatment, he has the ability to learn more effective ways of coping so that he does not have to turn to drug use or sabotage himself by making poor decisions. In addition, he has considerable abilities as evidenced by his operating successful businesses at a young age. The results from the TONI-3 also indicate average to above-average intelligence, which increases the likelihood that he will benefit from therapy.

In my opinion, it is unlikely that Mr. Hudson would continue to be involved in criminal enterprises. He has the intelligence and social skills necessary to make a successful transition back into society when he is released from prison. In addition, there was no indication that he has developed Antisocial Personality Disorder. It is also my opinion that his risk for recidivism would decrease even further with treatment for his substance abuse, and psychotherapy to help him process the trauma of his physical and emotional abuse.

10

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

## RECOMMENDATIONS

1. I recommend that Mr. Hudson participate in the Residential Drug Abuse program (RDAP) offered by the Federal Bureau of Prisons. Given his chronic daily marijuana use, a long-term drug treatment program such as the RDAP would be very beneficial.

2. I also recommend psychotherapy to address the consequences of his physical and emotional abuse. Since the abuse began at a young age, the impact has been significant in the formation of his personality. Therefore, I recommend one year of weekly individual and group psychotherapy to address the effect of the abuse on his life. Below are some suggestions for the treating professionals who will be involved in his care.

TREATMENT GUIDE

If additional clinical data are supportive of the MCMI-III's hypotheses, it is likely that this man's difficulties can be managed with either brief or extended therapeutic methods. The following guide to treatment planning is oriented toward issues and techniques of a short-term character, focusing on matters that might call for immediate attention, followed by time-limited procedures designed to reduce the likelihood of repeated relapses.

Worthy of note is the possibility of a troublesome alcohol and/or substance-abuse disorder. If verified, appropriate short-term behavioral management or group therapy programs should be rapidly implemented.

Once this man's more pressing or acute difficulties are adequately stabilized, attention should be directed toward goals that would aid in preventing a recurrence of problems, focusing on circumscribed issues and employing delimited methods such as those discussed in the following paragraphs.

Although short-term methods are likely to be suited to this man, the techniques of environmental management, psychopharmacologic treatment, and behavior modification may be of limited value in effecting change. Altering his attitudes toward himself and his less than socially acceptable behavior may best be brought about through procedures of cognitive reorientation. Once a baseline of rapport has been established, the man may be able to withstand methods that confront his dysfunctional beliefs and expectations (e.g., Beck, Ellis). The introduction of short-term interpersonal methods (e.g., Kiesler, Klerman) may next be employed to probe and modify his attitudes and social habits. More expressive and time-extended techniques may be applicable in this case, but they are difficult to justify

11

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

in that the man's illusions may be reinforced too strongly by the imaginative freedom these methods foster.

Focused interpersonal methods, such as group and family therapy, may help him view himself in a more realistic light and assist him in learning the skills of sharing and cooperation.

With a brief therapeutic focus, care should be taken not to stress the man's deficiencies because this may endanger the therapeutic relationship. Efforts must be made, however, not to allow him to assume a dominant posture in treatment after his initial discomfort has receded. What must be confronted early on is his likely belief that he need not consider changing his views because he believes he is already almost perfect. In sum, he may not accede to any but the briefest therapy, hence increasing the likelihood of early relapses. If he does become involved in a short-term regimen, he will maintain a well-measured distance from the therapist, trying to resist the searching probes of personal exploration, especially those that imply deficiencies on his part. An effective cognitive confrontation method should counter his efforts to shift responsibility for his own deficiencies to others. Unless dealt with directly, yet without disapproval on the part of the therapist, his evasiveness and unwillingness may seriously interfere with short-term progress. With a firm but consistently honest and confrontive technique, the treatment setting need not give witness to struggles in which he seeks to outwit the therapist and assert his dominance. The therapist must maintain great patience and equanimity to establish a spirit of genuine confidence and respect.

A strong cognitively based method to undo distorted expectations should focus on extinguishing his tendency to devalue others, not to trust their judgments, and to think of them as naive and simpleminded. Rather than question the correctness of his own beliefs, he assumes that the views of others are at fault. What should be questioned is his habit of assuming that the more disagreements he has with others, the more he is convinced of his own superiority and the more arrogant and presumptuous he is likely to become.

Although efforts should be made to rebuild the man's recently depleted self-esteem, the therapist should take care not to appear subservient in the process. The man's self-confidence may be rapidly restored by merely allowing him to recall past achievements and successes. This can often be attained in a few sessions. A goal more likely to prevent recurrences, however, is that of guiding the man into becoming more sensitive to the needs of others and accepting the constraints and responsibilities of shared social living. This will require strengthening the man's capacity to face his shortcomings frankly. Care must be taken in this regard not to be deceived by mere superficial compliance with these efforts.

12

Name: Dylan Hudson
Case #: 2:12-CR-00130-GEB

Thank you for the referral of Mr. Hudson for my evaluation.  I trust this information will assist you in the processing of his case in an effective manner.  Please contact me if I can be of other assistance.


Respectfully,

Frank D. Weber, Ph.D., ABPP
Clinical and Forensic Psychologist

13

*United States v. Dylan Hudson,* CR12-0130 GEB

# EXHIBIT D

# TO SENTENCING MEMORANDUM
# ON BEHALF OF DYLAN HUDSON



3000 Charm Way, Placerville, CA

*United States v. Dylan Hudson,* CR12-0130 GEB

# EXHIBIT E

# TO SENTENCING MEMORANDUM
# ON BEHALF OF DYLAN HUDSON

To Honorable Judge Garland E. Burrell,

     My name is Dylan Christopher Hudson, corresponding case # 12-130 GEB. I am taking this opportunity to acquaint you with details pertaining to my case, personal history and characteristics. I believe these are pertinent factors in defining me as a person and my role in the criminal matter at hand. I am going to expound on details of my family life, education, work history and some other relevant details.

     I am 28 years of age, and was born in Milwaukee, WI. My mother and father were already separated at the time of my birth. My mother was a very loving and caring person and did her best to raise us given the circumstances. Like most single parents she was forced to work long hours, and be absent from home, struggling to support her burgeoning family. She has had severe type II diabetes since she was 12 years old. Throughout my childhood she often fell into diabetic comas and swung like a pendulum between extreme high and low blood sugar levels. At an early age I was forced to learn warning signs that signified a diabetic blood sugar crash in order to prevent long term damage to my mom. I learned how to perceive subtle changes in behavior indicating a drastic blood sugar change, and to respond with glucose, insulin or a 911 call to the paramedics depending on the nature and severity of the situation.  It wasn't uncommon for my mother to fade out of consciousness while driving, drifting off the road or causing an accident. Menial, everyday tasks like cooking dinner or going out for groceries became dangerous and problematic. Working such long hours and struggling with her illness caused her to be detached when at home. My brother and I were frequently left to our own devices and raised ourselves. I often felt like I was the parent and it was my duty to take care of her. Living with my father was a different story altogether.

     My father was a severe alcoholic and struggling drug addict. For some reason he chose me to vent his frustrations on. As a child and throughout adolescence I was beaten constantly and over the minutest excuses. For some unspoken reason he singled me out as the recipient of his frequent outburst of rage; none of my other siblings were targeted in the abuse. The severity of the physical abuse varied from corporal punishments to successively more extreme forms. I received full force slaps and punches to the face, kicks to the body and head, dislocated and broken bones, was even beaten senseless with the butt of a loaded pistol and forced to play Russian roulette with live ammunition. Many of these incidents went unnoticed, but the more extreme cases were documented in my juvenile history. Most of my childhood with my father was spent living in terror, not knowing when these outbursts would occur. Despite the severity of physical abuse I experienced, I feel the effects of emotional neglect had a more significant impact on me. Despite the fact that I was an exceptionally intelligent child and typically at the head of my class I seldom received recognition or acknowledgment for my accomplishments in school or sports. The void left by the lack of paternal approval hurt me deeply and stayed with me for a long time. I was never able to fathom the reasons I was targeted for the physical abuse and neglected mentally and emotionally. When the Russian roulette incident occurred I moved back with my mother not to see my dad for over 10 years.

     When I returned to living with my mom, my academic performance plummeted. I started experimenting with drugs and became a full time marijuana addict. I was prone to bi-polar behavior, cycling between being depressed and withdrawn to being manic and compulsive. I felt as if I couldn't relate to anyone, and wanted to hide from the world. Drugs and alcohol helped me towards that purpose. I ran away from home for several months and was then placed into family services and eventually foster care. I was out of control and had alienated myself from everyone that loved me. I had failed two years of high school classes and hurt my family deeply. As I started to recover from the downward spiral, my mother took custody of me again and gave me one last chance.

     At this point in my life, I met several mentors; teachers that took special interest in me because they saw my potential.  They taught me to use the trauma I had endured as a reason to succeed not an excuse to fail. My grades rapidly turned into straight A's, and I made up all of the classes I had failed. I graduated on time in 2003. I even received 18 college credits from taking Advanced Placement courses, which I successfully completed during my senior year. I was listed on <u>Who's Who Among American High School Students</u> in 2003, a national publication that references people they predict will do great things due to exemplary academic performance, and overcoming extreme adversity.

All throughout college I worked two jobs, and paid my own way. I had a DJ and event production/ music entertainment business that I owned and operated that was successful, as well as working part time in upscale restaurants, the duration of my college career. I struggled with class attendance and my addictions, cycling between periods of sobriety and escape through the use of drugs. The classes I did attend I received A's and exhibited exemplary academic performance. Eventually I decided to halt my education and dedicate myself to my rapidly expanding music business. In 2008 I moved back to California to be closer to my family and expand my business further.

My business; SENS productions, took off in California, and started to bring in a lot of capital. I reinvested the profits into opening a horticultural hobbyist supply store, Two Dogs Global Hydroponics. I had observed a large demographic of Northern Californians indulging in hobby horticulture, and various agricultural endeavors, and accurately predicted that a business catering to this burgeoning industry would succeed. For the first two years the business was thriving. At this point my brother had a child, the birth of my niece brought my father back into my life.

For the first time in my memory, my father expressed pride and approval of my successes. I can't begin to explain how happy this made me, and how good it felt to finally feel loved by my dad. He stayed with me for a couple months and we developed a healthy relationship. He apologized for his heinous misconduct during my youth and I found the strength to forgive him. We conversed and bonded and did our best to make up for all of the lost years. During this time we discussed a plan of buying some property as an investment together, developing some of the parcels for resale and converting the rest into a permaculture community farm. His vast knowledge of carpentry, construction, and experience as a contractor and land developer coupled with my knowledge of horticulture, agronomy and permaculture made for a dynamic combination.

My father took a large portion of his retirement funds and allotted them towards a down payment on the property at 3000 charm way. We both invested incredible amounts of time, money and energy into realizing our shared vision. First we subdivided the land into four parcels, and started development of the property. My father and I worked together on all these projects which strengthened our relationship. He was foreman and mentor for all of the construction projects, while I headed the farming efforts. We planted over 100 fruit and nut trees, built chicken hutches to house hens for eggs, poultry and fertilizer, and started raising Berkshire pigs for organic pork. We cut and graded roads throughout the property, leveled and plotted building sites, and began construction. This was before my father's disease progress into its final stage.

My father has Hepatitis C and it reached its terminal form in late 2010. He started to bleed profusely from every orifice; his vomit, urine and excrement were filled with blood. His appendages swelled to a grotesque size, and his joints and ligaments became inflamed and burning with pain. He described it as, and looked to be in, complete agony. His liver was shutting down and his blood had become toxic. At this time he was too sick to continue work. H had to immediately begin dialysis and other expensive medical treatments or face the ultimatum of an early demise. Not only did I feel it was my filial duty to take care of him physically, but was left to shoulder the financial burdens of our projects without assistance.

We had several structures partially completed, that I now had to pay other contractors to come and finish. I was now solely responsible for the property's mortgage of $5,000/month, and combined with the downpour of medical bills and other developing financial strains was rapidly sinking. During the time I had spent away from my business, I had put what I thought was a close friend in charge of my hydroponic supply store. Unfortunately as my attention was focused on developing the property, he had driven the business into the ground. He had been selling products out of the back, and embezzling large amounts of money allotted for rent and sales taxes. By the time my attention refocused to the store it was hundreds of thousands of dollars in debt; the shelves were bare, and there wasn't anything with which to pay the many months overdue rent of $6,000 or the massive sales tax bill which was rapidly accruing interest. My father was hospitalized in late 2010, and eventually arrested on outstanding warrants for a DUI charge.

Under the extreme duress of my father's failing health, the financial burden of the property at 3000 charm way, and my failing business, I made the worst decision of my life. I felt that if I couldn't find a way to finance, and fix all of these problems I would lose not only my father's respect and invested retirement funds in the form of the property, but everything I had worked for including the business I had created, and the ability to care for and assist him with his medical bills. In my two businesses I had numerous employees that depended ion me for their lively hoods. If I allowed my business to fail I felt I would be disappointing not only myself and my family but them and their families as well. Regrettably these pressures influenced me to break the law and cultivate marijuana as a last resort. It was the worst mistake of my life, and the greatest legal transgression I've ever made. Although my actions weren't' motivated by greed, but by desperation I accept full responsibility for them and the extent to which I broke the law.

I am truly sorry and deeply filled with remorse over the decisions I made. I allowed my emotions to overcome reason and distort my legal compass pushing me to commit a crime that was detrimental to society. During this past year of incarceration I have spent countless hours on reflection and deep contemplation of my actions. Rather than preserving that which I had worked for, I brought dishonor to myself and my family, and jeopardized my integrity by endangering the community at large through the spread of illegal narcotics. For this I am ashamed. I see my past behavior through a lens of perspicacity and am dedicating myself to transforming the negativity of my actions into something positive. I believe that every failure is also an opportunity to learn and change. I am seizing this opportunity to better myself, finish my education, and begin therapy and drug addiction treatments. I know what I did was wrong, and have since learnt a great and total respect for the law and the authorities whom enforce it. I possess a great capacity for change and know that when given an opportunity I will be a law abiding asset to society, recidivism is not an option for me. I have a supportive loving family waiting for me and am eager to prove my worth as a contributing member of society.

I have faith in the American justice system and the wisdom of your judgment. I hope the details and information I have provided has been perspicuous and helpful in defining me and the case at hand. I am truly sorry for any time and resources of the courts and government that have been allocated and wasted on me. I have done my best to cooperate on all fronts and accepted full responsibility for my actions, immediately after my arrest. Thank you for considerations and taking the time to read this correspondence.

                                        With all due respect and sincerity,
                                        Dylan C. Hudson

*United States v. Dylan Hudson,* CR12-0130 GEB

# EXHIBIT F

# TO SENTENCING MEMORANDUM
# ON BEHALF OF DYLAN HUDSON

June 17, 2013

To whom it may concern,

Dylan C. Hudson is scheduled to come before you in court on July 12 of this year.  While he may be just another lawbreaker to you, I want to impress upon you that Dylan is a bright and industrious man, one who regrets the errors of his ways. Given that prisons rarely "improve" inmates, I ask that you consider alternative solutions in this matter.

Dylan suffered multiple, awful abuses at the hands of his father during his formative years.  The poor choices he has made recently reflect influences of his childhood, and while that does not excuse his behavior, it does shed light on it in a way that may inform your decision.  Dylan needs therapy, guidance and support, none of which is likely to be found in a long-term prison sentence.

I have watched you at work, witnessed your decision making over the fates of other people's fathers, mothers, sons and daughters and I do not envy your responsibility to be fair.  I believe you to be an honest man of integrity who is capable of considering circumstances that shape each of us and determining consequences appropriate to each individual.   Dylan has broken the law and shown very poor judgement.  I request that you consider long-term mandated counseling/therapy combined with whatever amount of time deemed sufficient for him to fulfill public/community service as a way for him to redeem himself in the eyes of the law while also getting assistance in the rehabilitation that he needs.

Dylan has many wonderful qualities that make him a candidate for rising above his past, taking responsibility for his actions, and finding reformative ways to make up for the crimes he has committed. He is a motivated and dedicated individual with energy and interest for many arenas.  He requires counseling and support to face "his demons" in order to be able to move forward in a positive and productive manner.  Please allow him an opportunity to meet his potential by mandating therapy as part of his sentence. As his mother, I have hopes for a better future for my son, one that includes his being accountable for his actions while also healing psychic wounds in order to avoid continuing an abusive pattern he has started from his past.  I implore you to consider creative solutions to break this pattern.  I know this may take more time and energy to do, but he is an asset to our community that should be utilized, not locked away and forgotten.

Thank you for your consideration, I trust your judgement to serve the people, and my son specifically.

Respectfully,

*Susan Snowmountain*

Susan Snowmountain

Dear Judge Burrell

Dylan Hudson is my brother, and I love him very much. Ever since he was arrested I have had something missing in my life, a hole that can not be filled, I think of him everyday, and every time I do I am filled with sadness, sadness for knowing where my brother is, and the hardships he will face there. I know that he has broken the law, and therefore deservise punishment, but before you sentence him there are a few things I want you to know. Dylan has always been there for me as a big brother, and hes done his best to help guide me, for someone who had no guidess themself. Dylan had a much more tramatic childhood then me, for he had an abusive father who was one of the worste role models anyone could have had. My brother is not a bad man,

he is a misguided child who has made all the wrong choices. I dont believe that he needs prison, I believe he needs a better role model, but I know that wont happen. I just wanted you to know this, and that he has a family who deeply loves and cares about him, and that when you do judge him hopefully you wont just see a face, you will see the man behind the face, who has a family and a life all who want him back as soon as possible.

P.S. when you do sentance him if you can keep him in California, so the family can continue to visit him so he wont get too lonely.

- Sincerely Elijah Dawber

Dear Judge Burrell,

My name is Hannah Dawber, and Dylan is my brother.  He is a good person and a great brother, and I don't think that going to jail will help him. Community service would be a better alternative. I miss him very much and I know that he misses his family as well.

Hannah Dawber

07/17/13

To Whom it May Concern,

I am writing on behalf of my brother Dylan Hudson, whom I have been close to my entire life. We grew up in a household where there was a lot of abuse. As his older brother, it was my job to protect him from my father's rage. I wasn't that strong and my father really liked picking on him, despite my attempts to protect him. Even as an adult, I still tried to steer him away from a life on the downward slope and again, I wasn't able to protect him from the demons that followed him in life. I too, developed addictive patterns to cope with the past and have luckily found help. I have been in therapy for years to help work on creative new healthy life patterns. This is what I see my brother doing when he gets home.

I have seen him shine academically through his scholastic years, and push himself to his limits to prove to his peers, teachers and family that he was as bright as his grades showed. I know he has been caught up in illegal activities but given a chance to be in a situation where he can excel, he will do best in a school environment where his true skills will be built. He is a great person, with a big heart who has the potential to be a great lawyer, businessman or professional given the chance. He chose the wrong life path and I know he regrets it. It is not always the person driving their life; sometimes it's the conditioning.

I know he will do better with his life after his prison sentence,especially if he wasn't forced to survive like an animal for the amount of time he will be in there. He is a good person that has made really poor choices, please don't perpetuate him down that road. I do believe he can learn the lesson in a couple years,especially if he has access to drug treatment. My fears are that 10 years could make sure he stays the same or ends up worse. Dylan is not a violent or malicious man, just a driven man with poor choice making skills. He deserves a 2nd chance at life please don't condemn him to a life of pain. Thank you for your time.

Sincerely

Zach Hudson

7/17/13

Russell Langley Dawber

PO Box 92

Colfax, CA, 95713

Dear Sir/Madam

I am writing this letter in connection with Dylan Christopher Hudson. Who is due to be sentenced by the Federal courts.

I first met Dylan in 1992 through his mother, whom I had started dating and was later to marry.  Our first interactions were anything but cordial, due to his subdued nature and somewhat socially inept behavior. Once I had gained his trust  he became much more responsive to me and through him and later through my own observations I began to learn about the abusive environment that Dylan was growing up in and around when he was with his father Mark Hudson.

Dylan's father Mark Hudson and I met in Big Sur and later had to co-parent due to the marriage of Dylan's mother and myself. Mark Hudson was and might still be a raging cocaine addict with mood swings that were very scary and violent. Once I started to discover the truth about the regular beatings, verbal abuse and even a hand gun being discharged by the father at Dylan. This last incident was reported by me to the Monterey police department and after that Dylan came to live fulltime with his Mother and myself.

While I understand that Dylan broke the law and that punishment is unavoidable, I do ask the court for compassion and mercy.  I accept that my stepson is required be incarcerated, all I ask is that the sentence be reformative and not punitive. So that when Dylan rejoins us, he will be able to become a productive member of society.

I ask for your favorable consideration in regard to my request, and should you have any questions please feel free to contact me at 530 575 9925 or e-mail at Russell.dawber@hotmail.com.

Many Thanks

Regards

Russell Dawber

June 26, 2013

To Whom It May Concern:

I am writing on behalf of my stepson Dylan Christopher Hudson. I met Dylan when he was just over a year old, and soon after married his father, Mark Hudson. Just before Dylan's second birthday he came to live with us for about 9 months and during that time, we became inseparable. This was the first of many times he lived with us either full time, and/or we shared in the raising of both him and his brother in Big Sur, CA, until he was twelve, at which time his father and I divorced.

As a child, Dylan was the most animated, smart, funny, energetic and determined little boy with a mass of wild, blonde curls and a smile that melted hearts. He had the energy of a bull in a china shop, and yet the tenderness and sensitivity of Ferdinand the Bull, as in the storybook.

To those who didn't know us, it was assumed Dylan was my birth son, and when he was really young, he called me either Mommy, or Mommy Nani, or simply Nani interchangeably. I used to call him my "little pig will," based on another storybook he loved to read, because he was game for almost anything, from taking out the garbage, to going on a bike ride, to doing errands. Going out on a date with my younger sisters, adolescents and teenagers at the time, was something he particularly loved to do, since he was so adored, and thus became the center of their attention and affection.

To watch Dylan in his element, whether on the soccer field, in the classroom, or as a lead role in a stage production was amazing. Time and again, he proved his ability to shine and succeed. Looking back, I see how much Dylan was a natural born leader. He was always the first up, the fist to try and fix something, to make something happen, or to solve a problem. When he was about 8 years old, we bought him an Erector set, because he liked to not only build things but to take them apart–it was about understanding systems, and Dylan, could be very systematic in his learning. He was a critical thinker naturally. He was not shy, but almost fearless, and rarely held back his enthusiasm. He was someone you wanted on your side.

When Dylan graduated from highschool I'll never forget when he was introduced as the student with the most different or unusual creative mind, challenging, charming, and yet enthusiastic, a combination that at times is mind-boggling, but is true, and has no-doubt served him well in the best aspects of his life.

After graduation, Dylan spent a week with us in Oakland, CA at Mills College, where I was in graduate school and living with Trevor and Nicoya, his 2 younger siblings. It was a remarkable week in so many ways–not only were we spending time together as a family (without his father) unit for the first time since he was 12, but we were able to share and talk about so much of his life growing up, and to reflect on the more positive and fun memories of those years. Trevor and Nicoya embraced having their older brother "home" and to themselves. He played with them; built with them, took them out, and in everyway was the brother that they so missed. It was for us, and I believe for him, very healing.

Since, we have kept in touch with Dylan mostly by phone, through family, and the occasional visit. My children, now grown, maintain their own unique relationship to their brother. Two years ago Dylan attended Nicoya's highschool graduation.  It was another moment where we were all together, along with his older brother Zachariah, for the first time in many years.

What has not been said in this letter is that Dylan faced many challenges and heartbreaks as a boy too, some reflected in the choices he has made as a young adult. As his stepmother, and the former wife of his father for 10 years (and someone who has known his father for a lifetime), I acknowledge that there were many instances of abuse–situations that I did not know how to fully counter and/or how to protect him or his siblings from. As Dylan grew up, there was confusion at his place in the family, as his father and I later had two children of our own, as did

his mother (his father, later again, had another child with another woman). I believe there was also a great deal of confusion for him early on during periods of going back and forth between the family homes in Wisconsin and in California, sometimes not seeing one parent for many months at a time. This confusion and sadness at times was acted out in alarming ways, like when he was younger and would have sweat-filled fits that could go on for up to an hour; often they occurred when he woke up from a nap. When these happened I would try to calm him by holding him close, in fact, nearly blanketing him with my arms, to sooth him. Sometimes it worked, other times it didn't, and he would just cry and cry, until exhausting himself.

As in many families with issues of substance abuse, communication was not always at its best, and the children were the ones that suffered. They often felt worried about their father's rage or disappearances, and rightfully, didn't always know what to expect from him. We, as a family, didn't always feel protected or safe. At the same time, their father provided for them and was smart, dynamic, and fun. Dylan looked up to his father, and in many ways, mirrored his best self. But his father's behavior could still be erratic and confusing, especially after we divorced. All of this has affected Dylan deeply. My own part in the dysfunction, and my inability to help guide Dylan better, over his lifetime, has pained me. My retreat and pulling away during the most difficult times was likely unhelpful and confusing.

Ultimately, what I do know is that Dylan was very much loved; he was embraced and closely connected and cared for by my own family and his mother's family. His aunt Tia wrote him and his brother letters throughout the times he lived in California, and she in Wisconsin. Growing up, he had a particularly close relationship with his paternal grandfather's wife, who seemed to understand his nature, and bring out the best in him. His paternal grandfather even took him on a several week trip to Cuba as a teenager. His father and he shared a love of reading, knowledge, and the ability to argue their point. In grade school, my son Trevor wrote a story about a hero in his life whom he wanted to be like–that hero was Dylan.

Some of these relationships got severed or fell to the wayside over time due to divorce, relocation, and other family situations, but I believe at the core, there is a great deal of care and love for Dylan. I believe he has the ability to withstand great hardship and endure. I believe that he is also capable of great compassion and care for others. He is extremely smart and capable, and can with the support of this court and his family, contribute to the betterment of his own life and to those around him.

Sincerely,

Romney Steele
Author/Chef/Mother

January 29, 2013

To Whom it May Concern:

I am writing this letter in regard to my nephew Dylan Christopher Hudson. I am under the impression he has a hearing this spring. I would like to address the court beforehand.

Dylan is not unflawed. He is a mixture of goodness, delight and decency, as well as a touch of vice. Dylan is human. He is inquisitive, tenacious, broad minded, self reliant, family oriented, adventurous, self-educated, poised . While these are admirable qualities, he can also be self-important, opportunistic, immature. It is possible the last three qualities may have brought him to his current situation.

I believe Dylan has done much soul searching during his incarceration. I believe he is at a crossroads. I believe given leniency, direction and optimism he can mature to employ his admirable traits for something significant.

I realize my words may not carry much weight, as I am a relative; however, these words are true, spoken from the heart. It is my hope that you hear them and take them to heart. Consequences do not need to be overly punitive to be effective in eliciting reform.

Thank you for allowing me to speak to the court.
Sincerely,

*Kate Wasechek*

Kate Wasechek

June 20, 2013

To whom it may concern:

I've had the honor of knowing Dylan Hudson for the majority of my life. I knew he was gifted since the first day I met him. Words cannot begin to describe the amount of intelligence and creativity that Dylan possesses. There is no doubt in my mind that Dylan is capable of projecting more positive energy than anyone I've ever met.

Dylan has inspired me to work hard, to be grateful for what I have and don't have, and to love every second of everyday. Of all the things that I appreciate about Dylan's character, I value his ability to express unconditional love and concern for his friends and family the most.

I understand the severity of the charges that Dylan faces and the consequences that may follow, however, it must not be overlooked that the biggest crime would be to segregate Dylan from his friends, family, and the rest of society.

Sincerely,

Orion Frank Ayala

June 10, 2013

To Whom it May Concern,

I am writing to express my support and concern for inmate, Dylan Hudson, soon to be sentenced for his crimes related to marijuana trafficking. As Dylan's sister in law, I have known him very intimately for 6 years now. I have always viewed Dylan as a younger brother and have been concerned for his health, safety and well-being since our first encounters.

I am professional in the field of trauma and addiction recovery, working on my Master's licensing as a mental health worker. Although Dylan and I lived very different lives, I have always been able to relate to him on this level. Dylan and I have shared many intimate moments discussing his past traumas and abuse, his deep desire to change and his fears around not knowing any real way out. He has always been fascinated by Buddhism and Yoga and longed to build the strength to engage in the related practices for the long term. Despite his dreams, he could not seem to get a grasp on his sobriety to make them come true.

I have an extensive resume in sustainable building and community development projects, working in the US, Europe and Latin America, in which Dylan and I would discuss his plans to create an intentional community and resource center on the land he was attempting to purchase in Placerville, CA. He has spent time at various retreat centers and undergone some trainings in Creative Community Arts and was seeking certification in permaculture arts and sustainable animal husbandry. Again, swayed by the illusion of his destructive habits, he was not able to clearly execute his true vision.

When we were together, Dylan would either be discussing his long term plans, seeking help and guidance for his deep inner wounds surrounding his dysfunctional relationships, or spending time with his niece, Satori, my daughter. Despite Dylan's internal battle, he is an amazing uncle, he is gifted with the ability to really reach a child on their level and is an amazing story- teller. Satori misses her Uncle, as he would spoil her a bit when he saw her and play with her in a way that no one else could.

I write this to clarify the history and surrounding that this man comes from. He has a loving, supporting and well educated family, involved in various creative and entrepreneurial endeavors. His brother and I have been involved in coffee farming and importing and are now starting a specialty coffee roasting company, in which Dylan is invited to be a part of when he is released. We both feel strongly that a healthy Dylan could be a wonderful asset to the company, which is why we hope he is able to receive adequate access to business trainings and academic resources.

Incarceration is a helpful step in getting Dylan to take responsibility for his actions and set him on the right path to sobriety. I do fear that a severely long sentence could impede on this process, as he will not be able to receive access to the level of treatment needed to address the developmental trauma and addiction issues he is challenged with.

I see this as an opportunity for Dylan's life to be turned around and properly guided through the hands of the courts. I am aware that Dylan needs to be made responsible for his maladaptive tendencies and criminal behavior. I do also see a great opportunity for the criminal justice system to be corrective. Sincerely hope you consider giving Dylan the chance to access the help he needs, through a lighter sentence, addiction treatment and access to educational services. This is a man with true potential, that can be used for positive contribution towards society. I thank you for the time to read this and these considerations.

Sincerely,

*Michele Castro*

Michele Castro

June 18, 2013


Dear Judge Burrell,

It is with sincere intention that I ask you to consider Dylan Hudson's attributes.  He is a spirited young man with energetic motivation and a self-starter.  His discipline and work ethics are admirable and contribute to his strength as a leader with a strong aptitude for teaching and guiding others. He is courageous and gentle. Dylan would make use of these characteristics performing work for the community, which would be beneficial for both Dylan and the community. I ask you to please consider community work for Dylan Hudson during his time of rehabilitation.


Sincerely,

Patricia Cornelius

June 19, 2013

To whom it may concern;

My name is Chelsea Belle Davey. I had the privilege to grow up in the tight knit rural community of Big Sur, CA. My family moved to the area in the late 60's and worked in the hospitality industry as well as many volunteer organizations such as the Volunteer Big Sur Fire Brigade and Cliff Rescue, the Gazebo School at Esalen Institute among others.

My grandparents had roughly 22 "foster" children in their care over the years including Mark and Smokey Hudson. My aunt, uncle and mother were extremely close with the Hudson family then and still are to this very day. To me, Mark Hudson is a true Uncle and Zach and Dylan are my cousins. I know that technically speaking we are not related, but a 30+ year bond in my belief surpasses that formality.

I have photographs of Dylan and myself as infants, as young children playing at the river and as teenagers. I have an immeasurable amount of memories and stories to tell about how Dylan has been there for me as an "older brother". He would come and stay with us from time to time as well. My family always has and always will offer our home to him. I know that he has always protected me, guided me and cared for me. I would trust Dylan with my life.

It has been a couple of years since we have seen one another as I moved to Los Angeles for three years and subsequently returned to the Monterey Peninsula roughly four years ago. Every now and again we touch base. Dylan is a striking man, he is fit and physically capable and very intelligent. The idea of this gentle and loving young man being locked away from his loved ones is heart wrenching.

I do hope that those who are judging him can see that he is innately a kind human being. That he would benefit... and that we all could benefit if he could be placed somewhere where he can work off his debts with community service. I am praying that he is placed with the California Department of Forestry and Fire or a treatment program of sorts. Dylan's capability physically and mentally would be a complete waste if he is incarcerated.

I long for the day when he can visit us all at home again. If there is anything else that I may offer to be of help to my kind brother please let me know. I miss him greatly and await his return.

Sincerely,

Chelsea Belle Davey

831-238-0214

*Feel free to call me at anytime.*

06/17/2013

Regarding Dylan Hudson,

I have always found him to be a very positive and engaging person, who takes it upon himself to help people.  I have witnessed him on several occasions go out of his way to be generous to people in a way that showed how much he understood them, a quality I find particularly rare in most people.  Also, I have known him to be conscientious to the extreme, a trait evident in all of the business and personal practices I have known him through. He's truly one of the better people I've ever met.

Sincerely,

Jacob William Doran

To Whom It May Concern,

My name is Codi Kissick and I am writing on behalf of Dylan Hudson. I have known this man as my friend for quite some time and believe it is important for the judicial system to understand him for the incredible human that he is rather than just a criminal.

Dylan is truly one of the most positive and amazing people I have ever met. He is extremely intelligent both academically as well as with reading people and situations. His thirst for knowledge is an ongoing process. He is highly motivated towards his goals and accomplishes what he sets out to do. He obviously has not always made the best choices, however, if focused on a positive goal he could do great things for this world. It would be a waste for our society to lock him away and forget about him. We need people like Dylan to make positive progress economically, socially, and politically. Dylan is also a very kind hearted and generous man. He would never do anything to intentionally hurt someone and he will always try to help if someone is in need. He wants all people to be happy and live fulfilling lives. He wanted to create a community that was based around that common goal and his compassion impacted many people. Even people that never joined him in any of his quests were touched my Dylan's presence. One conversation with Dylan can inspire a person to be better and more passionate about life. His intelligence, determination, kind heart, and ability to sustain relationships with both sexes balance in his natural ability to be a leader. When Dylan walks into a room he commands respect and people love him for it. People want to follow Dylan. Again this is why it is imperative for our society to do more with him than just put him away in prison. He has broken the law and there are consequences but it is important to give the right consequences based on the human he is, not just the criminal. Our society, as well as Dylan, would be best served by allowing him to use his talents for good. For example, community service projects, education, rehabilitation, etc. He is not violent or malicious in any way and by putting him in prison there is a good chance he will have to learn these traits to survive. Even if he is able to stay focused within himself and not take on the negative effects of prison the entire time he is locked up society is missing out on all the beneficial acts that he could provide. Lastly, Dylan is a humble enough man to take responsibility for his actions and to learn from them. By allowing him to spend less time in prison and more time back in society he will not make the same mistakes. He does not need years and years of being locked away to understand what he did was wrong and to learn to not do it again. Please take the time to look at his history and empathize with him as a human being. Dylan Hudson is a beautiful, intelligent, non-violent, confident, courageous, compassionate, kind, respected, motivated, hard working, loyal, positive and loving man. He has made mistakes but putting him in prison for too long will do more harm than good. These words are not written lightly and I hope they are met with an open mind and heart.

Sincerely,

Codi B. Kissick

Codi Kissick

June 1, 2013

To Whom it May Concern:

I am writing to recommend leniency in charges filed against Dylan Hudson. I've known Dylan since he was a child. He is an intelligent, family-centered, productive, hard-working, goal-oriented individual. Dylan has the vision of a 'big-picture' thinker. He sees what is possible and then, strategically, develops a plan to achieve his goal. What is rare, is that he also is attuned to small details in the application of his vision, and he is a creative problem-solver, as well. Dylan has exhibited many leadership qualities and if he were to focus these skills in an area that will benefit others, it would be a win/win situation for himself and those in need.

He is well-known in his community, has established roots there, and has ties to many friends and relatives in that area. Both he and his community would best be served by having him participate in a project that will enhance the quality of life for those in his community, rather than keeping him incarcerated.

Please do not waste the valuable skills and talents of this bright and industrious young man, but put those talents to work in the community, so that everyone can benefit from his leadership and entreprenuial qualities. Consider all of his attributes that can be utilized productively, for many to benefit, as you ponder the potential charges you will file against him.

Respectfully submitted,

Cynthia Muhar
3611 S. 15th St.
Milwaukee, WI  53221
(414) 256-4670
.

6/18/2013

In the last three years that I have known Dylan, I cannot recall anyone else that has as much integrity and character as he does with the exception of only a few close friends. It may be difficult to see the real Dylan Christopher Hudson from a distance. He carries himself very proudly and in our society that can be perceived as egotistical or cocky. If you have only seen his faults on paper and haven't had the opportunity of speaking with him, One may think he is only capable of making poor decisions that only benefit himself, or put him into the category of an "evil" person. I doubt that anyone would look attractive under these circumstances. I doubt many people will have malicious or bad things to say about Dylan.  If you know Dylan, you will rarely if ever shake his hand. He greets everyone with a hug. You don't even have to be a close friend. There is a large portion of my own family that doesn't greet each other like this. This may look like a small act when described in a letter, however it is no small act to show the people around you how glad you are to see them or how happy One feels after a visit. I can say after taking this on as practice that everyone you greet will remember and appreciate the sincerity.

Another quality of Dylan that may not be seen right away, but definitely should be considered, is the amount of respect that he has for world around us. Again you would not see this passing by someone in a shop or restaurant. A good example of this would be when about 20 people had gathered to have a barbecue.  Before the hog was put down, Dylan asked everyone to gather in a circle and give thanks to the owner of the farm, the land, each other, the hog, the experience, and the opportunity to enjoy something that was organic and homemade. Everyone gathered in a circle and gave thanks. Friends of mine that did not know Dylan commented on the act and were grateful to be in such good company. Again, this is an example of something that shows the true nature of an individual. If we were to document every "good" act that Dylan has done, we would never finish this letter. I chose these examples, because these show genuine characteristics of Dylan's identity. Poor choices or decisions do not make up who we are, as much as these examples show the true intent of someone's personality.

Mistakes are made by everyone. It is true that laws are laws and should apply to everyone.  I would hope that anyone reading this letter will consider Dylan Hudson's positive attributes and acts of kindness and generosity before making a judgment based only on mistakes listed on paper. Dylan is certainly capable of being a productive member of society and is not a danger or deviant. Hopefully my limited writing ability communicates the message that is intended.

Thank you for your time.

Andrew Roberson

My name is Andrew Roberson. I am writing this letter to state that the firearms with the serial numbers below were seized by the Department of Justice on 3/8/2012 and belonged to me. This is also referenced in the property receipt attached. All of the firearms were found unloaded and in a safe position at 3000 Charm Way in Placerville CA. These firearms were not meant to be used in any illegal manor or with any mal intent.

.22 caliber Marlin rifle   #15493161

Mossberg 12 gauge shotgun  #7674361

Westerfield 12 gauge shotgun   no serial number

30-06 rifle # 1532

Andrew Roberson

February 24, 2013

To whom it may concern:

    Dylan Hudson is a California prison inmate, (after being arrested in Wisconsin) and has been held for almost a year without being charged.   I expect there must be extenuating circumstances for him to be held without charges or bail for this long.   Dylan has expressed his willingness to face the consequences for his actions and awaits both charge and sentencing.   I request the court's consideration regarding sentencing; atonement (and correction) can be achieved without the expense and negative impacts of imprisonment.   I would, instead, ask the court to consider a more redemptive sentence for Dylan such as time spent in long-term monitored community service.

    I have known Dylan Hudson since he was a child.   He is smart, productive, capable, and hard-working.   The court now has an opportunity to let society utilize these attributes in a more positive and productive way.   Provide him a chance to truly take responsibility for his actions by spending time **doing for others** – a solution that serves to make up for what he has done and benefits all concerned.   Dylan Hudson is capable of redemption and restitution via a more considered solution of long-term volunteerism/service.   I appreciate the court's consideration regarding Dylan Hudson.

Respectfully submitted,

David Romary

315 N. Dunlap Ave.

VIROQUA, WI 54665

January 28, 2013

To whom it may concern:

Dylan Hudson has been held for nearly a year without charges or bail.  He is willing to face the consequences of his actions and I ask the court for leniency concerning the duration of time he spends behind bars.  There are many ways for Dylan to "make good" on what he has done.

Dylan is intelligent, hard-working, goal-oriented and productive.  He demonstrates leadership qualities.  Require him to focus his skills in ways that benefit society/those in need as a successful venture for all involved, rather than incarceration, which benefits no one.   Public service, for whatever length of time seems adequate, is an alternative that can have positive impact in an otherwise "negative" situation.

I have known Dylan Hudson since he was very young.   I believe my recommendation to be a viable solution toward his being able to make restitution.  Please allow Dylan Hudson this opportunity to redeem himself.

Respectfully submitted,

Antoinette Schneeberg

Antoinette Schneeberg

315 N. Dunlap Ave.

VIROQUA, WI 54665